(No. 49897.—

THE CITY OF SPRINGFIELD *et al.*, Appellees, v. ROBERT H. ALLPHIN, Director of Revenue, *et al.*—(Robert H. Allphin, Appellant.)

*Opinion filed Oct. 6, 1978.—Rehearing denied Jan. 25, 1979.*

KLUCZYNSKI, J., took no part.

William J. Scott, Attorney General, of Springfield (Thomas R. Meites, Special Assistant Attorney General, of Chicago, and David M. Frisse, John Brunsman and Samuel Sorich, Assistant Attorneys General, of counsel), for appellant.

Frank M. Pfeifer and Thomas W. Kelty, of Pfeifer & Kelty, P.C., and Fredric Benson, Corporation Counsel, of Springfield, for appellees.

MR. JUSTICE CLARK delivered the opinion of the court:

This case involves several aspects of the relationship between Illinois municipalities, which may impose certain taxes, and the State of Illinois, whose agents collect those taxes and distribute to the municipalities the revenue therefrom. Because of the complex nature both of that relationship itself, and of the role of the courts *vis-a-vis* that relationship, we deem it necessary to set forth the facts of the dispute in some detail.

Plaintiff city of Springfield is an Illinois municipality

which has, pursuant to sections 8—11—1 and 8—11—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, pars. 8—11—1, 8—11—5), enacted a municipal retailers' occupation tax and a municipal service occupation tax (Municipal Code of Springfield, secs. 41.33 through 41.39). Plaintiff Illinois Municipal League is an unincorporated association of Illinois municipalities. (See Ill. Rev. Stat. 1973, ch. 24, par. 1—8—1.) It apparently is conceded that some or all of the league's member municipalities also have enacted such taxes. (For convenience, the city and the league's member municipalities hereinafter will be referred to collectively as "plaintiffs" or "plaintiff municipalities.")

Defendant Robert Allphin was the Director of Revenue at the institution of this cause and, as such, was the officer in charge of the Illinois Department of Revenue. (See Ill. Rev. Stat. 1973, ch. 127, par. 4.) The Department is empowered to collect the municipal retailers' occupation tax and the municipal service occupation tax on behalf of plaintiffs. (Ill. Rev. Stat. 1973, ch. 24, pars. 8—11—1, 8—11—5.) In doing so, the Director was empowered to enforce plaintiffs' ordinances. (Ill. Rev. Stat. 1973, ch. 127, par. 39b1.) After collecting the tax, the Department was required to "forthwith pay over to the State Treasurer, ex officio, as trustee, all taxes and penalties collected." (Ill. Rev. Stat. 1973, ch. 24, pars. 8—11—1, 8—11—5.) On or before the 25th day of each calendar month, the Department was required to certify to the State Comptroller the amount of money payable to plaintiffs, as determined according to a statutory formula. The formula calls for the State's retention of a specified percentage of the amount otherwise payable to plaintiffs, to compensate the State for the cost of collecting and administering the tax. Within 10 days of the receipt of the Director's disbursement certification, the State Comptroller must draw orders for the disbursement of plaintiffs' share and for the deposit of the State's share into the General Revenue Fund. Ill. Rev. Stat. 1973, ch. 24, pars. 8—11—1,

8—11—5.

Public Act 78—1255 reduced the State's share from 4% to 2%. The central issue in this case is whether the Act became effective on December 5, 1974, or on July 1, 1975. The Director claims that the Act did not become effective until the latter date. Accordingly (with an exception not relevant here), during the period December 5, 1974, through June 30, 1975, he followed the old formula and certified that the larger amount be withheld by the State, and a correspondingly smaller amount be disbursed to plaintiffs.

Plaintiffs, however, claim that the Act became effective on the earlier date, and that in the interim (between December 5 and June 30) the Director wrongfully certified that the higher amount be withheld, resulting in the State's wrongfully withholding about $3 million from the plaintiff municipalities. In count I of their first amended complaint, plaintiffs sought a declaratory judgment (see Ill. Rev. Stat. 1973, ch. 110, par. 57.1) that the Act became effective on the earlier date. In counts II through IV plaintiffs seek reimbursement from funds currently being collected by the State. (The pleadings, however, do not precisely describe the funds to be placed into the protest fund. *E.g.*, count II, paragraph 11, refers to "tax revenues presently being collected," and count III, paragraph 10, refers to "sales tax receipts presently being collected.")

Defendants moved to dismiss the amended complaint, arguing (1) that the Act did not become effective until the later date, and, alternatively, (2) even if the Act became effective on the earlier date, the circuit court was without power to grant the relief requested. The circuit court granted judgment for defendants as to count I and dismissed counts II through IV.

On appeal, the Appellate Court, Fourth District, reversed as to count I (agreeing with plaintiffs' position on the effective date of the Act). As to counts II through IV,

the appellate court in effect vacated the circuit court's judgment, and remanded the cause to permit plaintiffs to amend their pleadings to pray for an alternative remedy suggested by the appellate court. (50 Ill. App. 3d 44, 50-51.) We granted defendant Allphin's petition for leave to appeal. We affirm the judgment of the appellate court as to count I, modify the judgment as to the remaining counts, and remand the cause to the circuit court. (For convenience, we will continue to refer to "defendants" even though the defendant Treasurer and the defendant Comptroller no longer are parties and have · taken no position on the merits, promising instead that they will perform whatever ministerial acts are necessary to enforce the decree.)

We postpone discussion of the effective date of the Act until we have addressed defendants' other arguments. Defendants first contend that the circuit court was without power to grant the requested relief because this action was, in effect, a suit against the State, and as such only could have been brought in the Court of Claims. (See Ill. Rev. Stat. 1973, ch. 127, par. 801.) We disagree. The drafters of our 1970 constitution considered the question of sovereign immunity to suits against the State in some detail. (See generally 2 Record of Proceedings, Sixth Illinois Constitutional Convention 871 (hereinafter cited as Proceedings); 3 Proceedings 1829-45.) In the end, the drafters adopted language permitting the General Assembly to reenact sovereign immunity. "Though our constitution of 1970 abolished sovereign immunity (Ill. Const. 1970, art. XIII, sec. 4) it was restored by the General Assembly, as the Constitution permitted." (*Department of Revenue v. Appellate Court* (1977), 67 Ill. 2d 392, 394.) Thus, the net effect of the legislature's response to the "sovereign immunity" provisions of the 1970 Constitution must be viewed as an adoption of the law as it existed under the 1870 Constitution. Yet even under the 1870

Constitution, the instant action would not be considered a suit against the State.

"Whether or not a particular action falls within the prohibition of the constitution has not been determined solely by an identification of the formal parties to the record. The determination has rather depended upon the particular issues involved and the relief sought." (*Moline Tool Co. v. Department of Revenue* (1951), 410 Ill. 35, 37.) Where the issue is whether a State officer has refused to disburse appropriated funds according to law, and the relief sought is an injunction directing that those funds be released in accordance with the appropriation, the action is not one against the State. (*County of Cook v. Ogilvie* (1972), 50 Ill. 2d 379, 383.) This is because "[t]he presumption obtains that the State, or a department thereof, will not, and does not, violate the constitution and laws of the State, but that such violation, if it occurs, is by a State officer or the head of a department of the State, and such officer or head may be restrained by a proper action instituted by a citizen." (*Schwing v. Miles* (1937), 367 Ill. 436, 441-42.) On the other hand, where the action is, in effect, one to quiet title in realty, adverse to the interest of the State (where there is no issue as to the lawfulness of a State officer's actions in obtaining title), the action is against the State. *Schwing v. Miles* (1937), 367 Ill. 436. See also *Georgeoff v. State* (1965), 32 Ill. 2d 534, 538.

More difficult are some of the cases involving suits by taxpayers seeking refunds of disputed taxes. In *Montgomery Ward & Co. v. Stratton* (1930), 342 Ill. 472, 477, the taxpayer availed itself of a statutory remedy of paying a disputed tax under protest (which temporarily prohibited the deposit of the disputed amount into the State treasury), but then failed to pursue the case in the manner provided by the statute. Instead the taxpayer sought to reduce its future taxes by the disputed amount. This court

held that the taxpayer was barred from "obtain[ing] indirectly what it could not obtain directly" (a refund from the State treasury). (342 Ill. 472, 477.) However, there is some ambiguity in the opinion, as to whether its holding was based upon constitutional grounds, or merely an equitable one, *i.e.*, waiver. Our research has revealed no subsequent decision of this court relying upon *Montgomery Ward* in support of the broad proposition for which it is advanced by defendants—that the Constitution bars one from obtaining indirectly what one could not obtain directly.

*Adams v. Nudelman* (1940), 375 Ill. 217, is of limited applicability here, because its applicability has been narrowed substantially in subsequent decisions of this court. In *Adams*, taxpayers filed suit for a refund of taxes which had not been paid under protest and, consequently, already had been paid to the State treasury. Plaintiffs sought relief either out of the State treasury, or out of funds currently being collected by the State and not yet deposited in the treasury. This court held (1) that the suit was against the State, and, alternatively, (2) that no relief could be had without a legislative appropriation. (375 Ill. 217, 219.) However, almost immediately, in *People ex rel. Swartchild & Co. v. Carter* (1941), 376 Ill. 590, 594, and *People ex rel. Adams v. McKibben* (1941), 377 Ill. 22, 24, the court narrowed *Adams* second alternative holding, limiting it to the prevention of payments directly from the State treasury, and refusing to apply it to court or administrative orders which had the effect of withholding funds from the State treasury. A decade later, in *Moline Tool Co. v. Department of Revenue* (1951), 410 Ill. 35, the court also narrowed *Adams* first alternative holding, stating that "a proceeding to review the determination of an agency of State government which, itself, has the force of a judicial determination" is not a suit against the State. 410 Ill. 35, 38.

While *Moline Tool* was a proceeding under the Administrative Review Act (Ill. Rev. Stat. 1949, ch. 110, par. 264 *et seq.*), its applicability is not confined to such cases. (*E.g., E.H. Swenson & Sons v. Lorenz* (1967), 36 Ill. 2d 382, 385.) The *Swenson* case also is particularly significant in that, like the instant case, it involved a claim that a State department wrongfully directed that certain funds be withheld from plaintiffs. This court rejected defendants' claim that, because the burden of any declaratory judgment would fall upon the State, the action was one against the State, and therefore barred by sovereign immunity. Rather, the court intimated that the action was, in essence, a review of the legality of the defendants' withholding of funds from plaintiffs, and as such was not a suit against the State. Significantly, the court capped its analysis by observing: "We think that the basic nature of the plaintiffs' claim is not altered by the circumstance that in this case the Department *** was able to resort to self-help ***." 36 Ill. 2d 382, 385.

Our review of the foregoing cases leads us to conclude that the issues involved in the instant case (the effective date of a statute) and the relief requested (a declaratory judgment and the withholding of certain funds from the State treasury) do not render the instant case a suit against the State. That the relief requested necessarily will have an impact on the State's General Revenue Fund is not dispositive. As in *Swenson,* defendants' resort to "self-help," in ordering the deposit of the disputed funds into the State's General Revenue Fund does not prohibit the courts from fashioning an appropriate form of relief. The cases relied upon by defendants for the contrary proposition (*e.g., Adams v. Nudelman; Montgomery Ward & Co. v. Stratton*), to the extent they remain viable, involve the ancient and much-litigated adversary relationship between the taxpayer and the tax collector. Extensive statutory procedures exist for the protection of the taxpayer's

interest in an orderly fashion which also will protect the State's interest. A taxpayer's failure to avail himself of such procedures may constitute a waiver of his rights against the State. (See, *e.g., S.A.S. Co. v. Kucharski* (1972), 53 Ill. 2d 139, 142.) The instant case, however, involves the fiduciary relationship between the State government's central tax-collection authorities, and local governments who would be, in practical effect, at the mercy of those authorities if there were no equitable means to remedy unlawful actions of State officers. Neither our constitution nor any act of the General Assembly contemplates that State officers be given such unlimited power.

Finally, contrary to defendants' position, the framers of our 1970 constitution apparently did not intend the requirement that all "payments from public funds" be made "only as authorized by law" (Ill. Const. 1970, art. VIII, sec. 1(b)) as a limitation upon the powers of the circuit courts to fashion appropriate remedies. (See 2 Proceedings 871 (colloquy of delegates Kamin and Cicero).) (None of the foregoing, however, is intended to address limitations imposed upon the judicial power of the United States by the eleventh amendment to the United States Constitution. (*Cf. Edelman v. Jordan* (1974), 415 U.S. 651, 668, 39 L. Ed. 2d 662, 675-76, 94 S. Ct. 1347.) There might well be a difference between a State's amenability to suit in State and Federal court. See, *e.g., McDonald v. Illinois* (7th Cir. 1977), 557 F.2d 596.)

We now turn our attention to the merits of the underlying dispute. Our constitution directs the General Assembly to "provide by law for a uniform effective date for laws passed prior to July 1 of a calendar year," and further provides that bills "passed after June 30 shall not become effective prior to July 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier

effective date." (Ill. Const. 1970, art. IV, sec. 10.) It therefore is important not to confuse the date on which the bill "becomes a law" with the date on which that law becomes effective; the two need not coincide.

To execute its responsibilities under section 10 of article IV, the legislature enacted and the Governor approved "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1971, ch. 131, par. 21), which provided as follows:

> "A law passed prior to July 1 of a calendar year and after June 30, 1971, shall become effective on October 1 following its becoming a law unless by its terms it specifically provides for a different effective date. A law passed prior to July 1, 1971, shall become effective on July 1, 1971, or upon its becoming a law, whichever is later, unless such law by its terms specifically provides for a different effective date."

In *People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242, this court held that a bill which had been the subject of an amendatory veto by the Governor (see Ill. Const. 1970, art. IV, sec. 9(e)) did not "pass" for purposes of the foregoing constitutional and statutory provisions until the legislature had approved the Governor's specific recommendations. The court reasoned that "passage" meant "the last legislative act necessary so that the bill would become law upon its acceptance by the Governor without further action by the legislature" (50 Ill. 2d 245, 247), and that the approval of the Governor's recommended amendments to the language previously adopted by the legislature was such a legislative act, before which no bill may be said to have "passed" (50 Ill. 2d 245, 247-48).

Subsequent to the 1972 decision in *People ex rel. Klinger v. Howlett,* the legislature passed and the Governor approved "An Act to revise the law in relation to the effective date of laws ***" (1973 Ill. Laws 196, Ill. Rev. Stat. 1973, ch. 131, pars. 21 through 26), which, *inter alia,* provided that "[f] or purposes of determining the effective

dates of laws, a bill is 'passed' at the time of its final legislative action prior to presentation to the Governor pursuant to paragraph (a) of Section 9 of Article IV of the Constitution" (Ill. Rev. Stat. 1973, ch. 131, par. 23). We need not and we do not decide whether this new statutory definition of "passage" is constitutional and, if so, what impact, if any, it has upon the effective date, as determined according to *Klinger*, of laws which have been subject to an amendatory veto. (But see Gherardini, *Effective Date of Laws*, 11 J. Mar. J. Prac. & Proc. 363, 375 (1978).) The instant case involves only the question of the effective date of a law which had been the subject of a simple, nonamendatory veto, and we hold that, in this situation, the new statutory provision accurately codifies our interpretation of the constitutional provision.

Public Act 78—1255, which did not contain an effective date, originally passed in the General Assembly (as Senate Bill 265) on May 29, 1974. The Governor vetoed the bill on July 26, 1974; the Senate voted by the requisite three-fifths majority to override the veto on November 21, 1974, and the House did the same on December 5, 1974, on which date the bill became a law. (See Ill. Const. 1970, art. IV, sec. 9.) Thus, the question presented is whether, for purposes of section 10 of article IV (Ill. Const. 1970, art. IV, sec. 10) and section 1 of "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1975, ch. 131, par. 21), Senate Bill 265 "passed" at the time of its initial passage by the General Assembly. We conclude that it did.

Unlike the override of an amendatory veto, the override of a simple nonamendatory veto does not involve any additional "legislative act" (50 Ill. 2d 242, 247), as that term is used in *Klinger*, because the original language of the bill remains intact, and no additional time need lapse to assure that the public has adequate notice of that language. Rather, the situation here is analogous to that in

*Board of Education v. Morgan* (1925), 316 Ill. 143 (construing Ill. Const. 1870, art. IV, sec. 13), where a bill passed by the General Assembly prior to July 1 and approved by the Governor subsequent to July 1 was, for purposes of determining its effective date, held to have "passed" prior to July 1. In determining the effective date of an act, we see no reason to treat the legislature's override of the Governor's simple veto any differently than the Governor's signature. Each has the same effect on the contents of the enactment and the public's notice thereof. To the extent that the purpose of determining the effective date of an act according to the date of its passage is to afford the public adequate notice of the contents of the enactment (see, *e.g.,* 6 Proceedings 1390), actions which similarly affect the contents should have a similar effect upon their effective date. To the extent that the constitutional provision is intended as a check upon the year-round drafting of laws by the legislature (see, *e.g.,* 4 Proceedings 2900-03), that intent also is in no way undermined by our holding today.

Although it is true that the Constitution itself uses the term "passes" to describe the legislature's override of the Governor's veto as well as the legislature's initial passage of a bill (Ill. Const. 1970, art. IV, sec. 9(c)), that usage is not dispositive of the meaning of the term in the different context of section 10 of article IV. (*Cf.* generally *Chapman v. County of Will* (1973), 55 Ill. 2d 524.) We find additional support for this conclusion in an opinion of the Attorney General (1975 Ill. Atty. Gen. Op. 77) regarding the effective date of Public Act 78—1257, which has a legislative history similar to the act at issue here. As the appellate court correctly noted (50 Ill. App. 3d 44, 47), a well-reasoned opinion of the Attorney General is entitled to considerable weight in resolving a question of first impression in this State regarding the construction of an Illinois statute (*People v. Simpkins* (1977), 45 Ill. App. 3d

202, 207; *Alsen v. Stoner* (1969), 114 Ill. App. 2d 216, 222; *Strat-O-Seal Manufacturing Co. v. Scott* (1966), 72 Ill. App. 2d 480, 485; *City of Champaign v. Hill* (1961), 29 Ill. App. 2d 429, 442; see generally Scott, *The Role of Attorney General's Opinions in Illinois,* 67 Nw. U.L. Rev. 643, 649-53 (1972)), though, of course, such opinions are not binding upon this court (*People v. Savaiano* (1976), 66 Ill. 2d 7, 16; *Rogers Park Post No. 108 v. Brenza* (1956), 8 Ill. 2d 286, 292). Accordingly, we hold that Public Act 78—1255 became effective on December 5, 1974, the day on which the second house overrode the Governor's veto.

Finally, because we hold that the remedy requested by plaintiffs was an appropriate one, we need not reach the merits of the alternative remedy suggested by the appellate court. We do direct, however, that, upon remand, the circuit court grant plaintiffs leave to amend their complaint to define more precisely the tax revenue from which the plaintiffs may obtain reimbursement. The relief requested should be amended to limit the funds from which each plaintiff municipality may obtain relief to the municipal retailers' occupation tax revenues and municipal service occupation tax revenues subsequently collected by the Director on its behalf. The net effect of such relief should be to reduce the amount of such taxes withheld by the State until the earlier overwithholding is compensated for.

For the foregoing reasons, the judgment of the appellate court is affirmed, as modified, and the cause is remanded to the circuit court with directions to proceed in accordance with the views expressed in this opinion.

*Affirmed as modified;*
*cause remanded, with directions.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.